**In Re the Matter of R. M., Petitioner,**

v.

**C. M., Respondent.**

**No. CS99–04606.**

Family Court of Delaware,
Sussex County.

Submitted: Feb. 18, 2004.
Decided: May 17, 2004.

---

prets as the mailing date, husband's request must be DENIED.[1]

Bruce A. Rogers, Esquire, Bruce A. Rogers & Associates, Georgetown, Counsel for Rachel Martin.

Thomas E. Gay, Esquire, Stumpf, Vickers, and Sandy, P.A., Georgetown, Counsel for Chris Martin.

HENRIKSEN, J.

The Court entered a Decision and Order on February 2, 2004. The Decision was mailed February 4, 2004. The Decision came after a trial that lasted four (4) days spread over approximately one (1) year and addressed matters of marital property division, temporary and permanent alimony, and fees and costs.

On February 10, 2004, wife timely filed a Motion for New Trial and Reargument. On February 18, 2004, husband filed an Answer to wife's Motion. Husband also included *"by way of further response"* a request that the Court modify its Order of February 2, 2004 to reflect a sixty/forty (60/40) division of marital estate in wife's favor rather than the sixty-five/thirty-five (65/35) division of property the Court granted in its Decision.

Because husband's request, although clothed in an Answer to wife's Motion, was filed more than ten (10) days after the entry of judgment, which the Court inter-

## LAW

■ Turning to wife's Motion for Reconsideration/Reargument, the Court notes that a Motion for Reargument *"is appropriate where it is shown that the Court overlooked a precedent or legal principle that would have controlling effect, or that it misapprehended the law or the facts such as would affect the outcome of the Decision."* [2] A Motion for Reargument should not be a vehicle for one party who was unhappy with the Court's ruling to simply rehash the arguments already heard and decided by the Court [3], nor can a Motion for Reargument be used to introduce new evidence and/or new arguments which could have been, but were not submitted at trial.[4]

## ANALYSIS

The Court took copious notes during the several days of trial that were spread out over a year's time. In writing its Decision, the Court took an extensive amount of time in reviewing those notes, comparing them to the final written arguments of counsel, and where there were inconsistencies or absences of information, going back to the Pre–Trial Order of the Court where values of various items of property were provided, especially as to certain stocks and bank accounts.

The Court also conducted a telephone conference with the attorneys on Decem-

1. Family Court Civil Procedural Rule 59(b) and (e) and *Ronald C.L. v. Doris S. L.*, 2000 WL 1658610, at *17 (Del.Fam.Ct.2000).

2. *Interim Health Care v. Fournier*, Del. Ch., C.A. No. 13003, Jacobs, V.C. (Mar. 25, 1994) 1994 WL 148266 (Del. Ch.1994).

3. *In Re Marriage of Gray*, Del.Fam., C.A. No. CN94–09568, Tumis, J. (Jan. 7, 1997), Slip.

Op. at 5; *J.C.W. v. SD.V., Sr.*, Del.Fam., C.A. No. 34, 856, Jones, J. (Oct. 9, 2000); 2000 WL 33200979 (Del.Fam.Ct.2000).

4. *In Re Marriage of Gray*, Del.Fam., C.A. No. CN94–09568, Tumis, J. (Jan. 7, 1997); *Shaunttell C.L. Draper v. Medical Center of Delaware, Inc.*, Del.Super., C.A. No. 92C–02–188–RRC, Cooch, J. (Oct. 19, 1999) (ORDER); 1999 WL 1441994 (Del.Super.1999).

ber 2, 2003. The Court scheduled the conference because, having carefully reviewed its notes, counsels' closing arguments, and the Pre-Trial Order, the Court had questions for counsel that the Court hoped to have answered before writing its Decision. One of the areas of uncertainty concerned the Wilmington Trust accounts and Wilmington Trust stock. The telephone conference of December 2, 2003 provided some clarification of the Wilmington Trust dividend reinvestment accounts. However, even after the teleconference, the Court still had questions about both the number and value of shares of the Wilmington Trust stock. The attorneys did not provide any follow-up information to clarify this somewhat vague area.

The Court's December 2nd teleconference also reminded the attorneys that the Court had left the record open on the last day of the trial, July 28, 2003, in order that each side could supplement the record with copies of their individual 2002 income tax returns and also wife's 2003 pay stubs. The Court told counsel that the Court had received husband's 2002 income tax return, but had not received wife's information. Wife's counsel believed he had provided wife's information to the Court, but the Court noted to wife's counsel that the Court had not seen the information in the file. Wife's counsel told the Court that he would provide the Court with wife's 2002 income tax returns, 2002 W-2 forms, and 2003 pay stubs "ASAP". Unfortunately, this information was never provided.

The Court also confirmed with the attorneys in the December 2nd teleconference that only the husband provided a current income and expense list. Husband did so by both exhibit and testimony. Wife did neither.

### 1. *Erroneous and Unsupported Factual Allegations*

The Court has reviewed all of wife's allegations of factual and legal errors. Some of the fifty-three (53) allegations contain such obvious errors to cause the Court to wonder whether wife and/or her attorney fully reviewed the entire Decision. For example, wife began early in her allegations, at Paragraph 5, alleging that the Court failed to make an adjustment on the value of the marital home. Page 32 of the Court's opinion, and also Items 1 and 2 on the Wright Chart contained in the Court's opinion as *Exhibit A,* made very clear that the Court incorporated the real estate adjustment. This same complaint was again raised in Paragraph 31 of wife's Motion.

When reviewing wife's allegations in Paragraph 27 of her Motion, the Court believes that wife and her attorney must have misread the paragraphs on Pages 29 and 30 of the Court's Decision. The clear wording of the Court's Order demonstrated that the twenty-four percent (24%) of the business entity that had been inherited by one (1) brother was then divided between the two (2) other brothers, one (1) of whom was the husband in this case. This occurred during the marriage. The twelve percent (12%) thus acquired by husband from the one (1) departing brother became part of the marital estate.

Wife's Motion also made several allegations, many of them redundant, that there was nothing in the record to support the Court's findings, when, in fact, the Court recalls a considerable amount of testimony being placed on the record. For example, despite wife's allegations to the contrary, the Court recalls very specific testimony that the Glatfelter Pulpwood Company was the family business's sole client. In addition to the specific testimony of C M, wife's *Exhibit* 33 entered into evidence on August 14, 2002, was a management questionnaire. The responses by husband to Questions 61, 120 and 122 in the management questionnaire further made clear

that the business had the sole client of Glatfelter Pulpwood Company. The only proof to the contrary was an exhibit in *Supplement* 4D which reflected in December of 1989 the company received two (2) payments from Collins Saw Mill. Given that these payments occurred more than ten (10) years before the present proceedings, and that there was no other evidence suggesting clients other than Glatfelter, the Court was correct in relying on the testimony and documents presented that Glatfelter Pulpwood Company was the family business' sole client. This complaint was contained not only once in wife's allegations, but at least four (4) separate times in Paragraphs 7, 11, 16 and 21.

In some of the allegations of wife's Motion, wife suggested that certain exhibits supported wife's allegations. And yet, wife failed to identify those exhibits or attach to her Motion a copy of the particular exhibits. The Court would have found such attention to detail extremely helpful. Having to make its own search through the many exhibits, the Court was unable to find the alleged exhibits.

Wife also alleged repeatedly that husband's expert witness, Mr. Premo, was the accountant for the business, when, in fact, the Court found clear testimony from Mr. Premo that he was not the regular accountant for the business. Mr. Premo made very clear that several years ago he assisted the three (3) brothers of the family business when one (1) brother wanted to sell out to the remaining two (2) brothers. Mr. Premo was not involved with the business again until he was called in to evaluate the business for the present litigation. There was no evidence to suggest otherwise. Wife also suggested that the Court failed to take into account Mr. Premo's credibility, or lack of it, when the Court valued the logging business. Actually, the Court pretty much disregarded Mr. Premo's valuation and relied mainly on the

expert opinion of wife's expert, Mr. Charles Sterner. Thus, if in fact Mr. Premo was the company's accountant, or demonstrated some special prejudice at trial, such a finding, had it been made, would have produced a harmless error where the Court relied mainly on wife's expert's opinion. Allegations that the Court misjudged Mr. Premo's testimony and overlooked his alleged prejudice were set forth in at least four (4) paragraphs of wife's Motion to Reopen, being Paragraphs 8, 12, 13 and 15.

In Paragraph 13 of wife's allegations regarding Mr. Premo, wife incorrectly stated that the Court's Decision reflected that the Court had, in her words, "*adopted the position of this highly questionable 'expert' (Mr. Premo) . . ./that the real estate [was] clearly inherited*". A careful reading of the Court's Decision, at Page 13 of the Decision, reflects that the Court stated, "*In Mr. Premo's opinion* (Emphasis added), *the real estate was clearly inherited.*" Any conclusion the Court made as to whether or not certain property was inherited was made after considering the testimony of all the witnesses and also after reviewing the exhibits, especially the Will, Inventory and Delaware Inheritance Tax Return filed in the estate of husband's stepmother. Husband's father, who previously owned the logging business, had willed his entire estate to his sons' stepmother, including the logging business.

Wife's Motion also suggested in several paragraphs that the Court failed to understand the real nature of certain transactions, suggesting that these transactions were merely a ploy of husband to conceal property. The Court recalls that it considered each of the transactions and whether these transactions might have acted as a concealment of property. The Court concluded that the transactions were appropriate and accompanied by legitimate business reasons. For example, in Paragraph

10 of her Motion, wife complained that the Court failed to pursue Mr. Sterner's concern that there had been a great drop in depreciation in the business's equipment. The Court can assure wife that the Court shared this concern after hearing the testimony of her expert, Mr. Sterner. But after the Court heard from Mr. Premo, the Court, on at least this issue, fully accepted Mr. Premo's very reasonable explanation as to why the company had shown a great drop in depreciation which coincided with Mr. Premo's valuation of the business for purposes of the divorce. As Mr. Premo explained, the business, which had not been overseen by him, but instead had been overseen by less qualified bookkeepers, had failed for many years to take off their books lost or obsolete items for which depreciation was still being claimed. The Court also found extremely reasonable that this logging business, which continued in operation, purchased after the parties separated some very expensive logging equipment, which, by reason of its use, would naturally quickly depreciate. Had the brothers purchased items following husband and wife's separation that were not related to the operation of the business, the Court might have found the acquisitions to be more questionable. Wife discussed her concerns as to these major purchases of equipment, and their depreciation, in Paragraphs 17 and 18 of her Motion. The Court questions whether it was proper for counsel to suggest that the Court had *"turned a blind eye"* on the matter.

## 2. *Rental Income*

■ Paragraphs 41 and 42 of wife's allegations related to a trailer lease and also rental income from a farm. The Court believes that the Decision accurately reflected the testimony given regarding the rental income from the farm, noting that the testimony concerning the farm rental was somewhat confusing. The Court was incorrect when it stated that wife provided no clear proof of the trailer lease from husband to Roger Kernaghan beginning January 21, 1999, providing rental income of $400 per month.

The Court's review concerning the trailer lease indicated that wife provided some brief testimony that included introducing into evidence a photocopy of the lease (wife's *Exhibit 10* ), that husband received the rent, and that the trailer rented by Mr. Kernaghan was located on the business property. Although the Court cannot recall if husband testified that the trailer was his pre-marital property, husband's closing written argument suggested the trailer was pre-marital. There was also testimony that husband moved from the marital home to a trailer when the parties separated on July 19, 1999. The Court does not know whether husband moved into the trailer rented by Mr. Kernaghan or into another trailer. The Court is unclear who owns the trailer or trailers, and when and how the trailer or trailers were acquired. Given that these trailers apparently are situated upon the lands of the family business, a further explanation of the trailers and any rent associated with their ownership will be allowed as part of the determination and value of the business real estate.

## 3. *Credit Account Information*

■ In Paragraph 40 of wife's Motion, wife stated that she had placed into the record appropriate documentation to prove purchases she made on her credit card. It became evident at the Court's pre-trial on March 23, 2001 that wife had certain credit card debts of which husband claimed he had no knowledge. One (1) of those debts was wife's First USA MasterCard. The other debt was wife's Wilmington Trust Company stand-by account. The Court's Pre–Trial Order of March 23, 2001 required wife to provide husband with photocopies of the statements on these two (2)

accounts going back to January 1998. It had always been husband's argument that wife failed to provide the necessary information pursuant to the Court's Order. Placed into evidence was a photocopy of a letter from wife's attorney to husband's attorney dated May 10, 2001. The letter purported to have provided to husband's attorney the monthly statements on these two (2) accounts. Unfortunately, however, only the letter itself came into evidence, without the purported exhibits. Even so, a review of the actual exhibits on these two (2) accounts which wife placed into the record was quite illuminating and further demonstrated wife's failure to provide husband with sufficient information to answer the real questions concerning these accounts, that being when they were created, whether the expenditures benefited the marriage and whether husband had any knowledge of the existence of these accounts.

The Court heard wife's testimony about these accounts on the last day of the trial, that being July 28, 2003. Wife was somewhat vague in her responses to husband's counsel's questions as to whether or not the information on the First USA account was provided or not provided to husband's attorney. Wife was definite in her testimony, however, that the First USA account had its beginning in January 1999 when wife transferred credit card balances of three (3) of her Wilmington Trust accounts into the First USA account. But a close review of wife's *Exhibit 5*, which contained statements of the First USA account which wife placed into evidence, indicated clearly that the First USA account was in existence prior to January 1999. Thus, a review of the first (1st) monthly statement which wife made available to husband and the Court, that being the statement with a billing cycle closing January 7, 1999, reflected a payment of $121 on December 17, 1998, as well as a cash advance of $339 on December 30,

1998. This particular statement also reflected that the account had a then balance of $3,530.36. It was not until the following statement with a closing date of January 18, 1999 that the transfers of the three (3) Wilmington Trust account credit cards into the First USA account appeared on the billing statement. Thus, not only was wife incorrect in her testimony that she could not produce First USA account statements prior to January 1999 because it did not exist, wife also failed to give any explanation of how she built up the balances on the three (3) Wilmington Trust credit cards that she transferred to the First USA account. Between the statement of January 7, 1999 and January 18, 1999, the balance of the First USA account grew from $3,530.36 to $9,921.69.

Wife also failed to provide all of the statements for the First USA account forward from her January 7, 1999 alleged beginning date. Thus, there was a six (6) month gap between her statement of August 16, 1999 where there was a balance of $8,573.56 to her next produced statement of February 15, 2000. The February 15th statement reflected three (3) purchases at the Dress Barn and had a balance of $8,102.15. Thereafter, there was a gap of one (1) year nine (9) months until the next statement for the period of November 16, 2001 to December 17, 2001. At that time, after reflecting expenditures to Lord and Taylor, Amy Taylor, Toys 'R Us, and SPA Merchandise in Buena Vista, Florida, together with two (2) cash withdrawals of $1,000 each, the balance had risen to $11,841.92. One (1) of the cash withdrawals was to cash, presumably to wife, and the other cash withdrawal was written to wife. The statements then ran on a monthly basis until the last statement provided to the Court for the period May 16, 2002 to June 17, 2002. During this time period, the Court found no purchases made by wife, with only payments being made.

Turning now to the Wilmington Trust Company stand-by credit account of wife, wife again failed to provide the necessary information which was justifiably requested by husband. Despite the Court's Order requiring wife to provide statements back to January of 1998, wife's first (1st) statement was dated February 7, 1999, where the account already had a previous balance of $3,530.36, and a new balance of $3,432.44. The monthly statements over the next seven (7) months until the statement of August 7, 1999 saw various payments made on the account, and also various cash withdrawals against the account, leaving a balance on August 7, 1999 of $3,711.49. None of the statements reflected the purpose of the cash withdrawals, nor did wife provide an explanation of how these monies were spent. There was then a seven (7) month gap from the statement of August 7, 1999 to the next statement of March 7, 2000, where the balance was $2,877.99. Thereafter, there was a gap of one (1) year and nine (9) months until the statement of January 7, 2002 which showed a balance of $4,168.31. Again, over the next several months, following the statement of January 7, 2002, there were numerous cash withdrawals ranging from $400 to $450. The balance of the account was reduced to $55.49 on the July 7, 2002 statement due to a lump sum payment of $4,710.91 made on the account on June 27, 2002.

In both the First USA and Wilmington Trust Company stand-by accounts, wife clearly failed in her responsibility to provide Court-ordered satisfactory information to husband, so that husband would have been in a position to determine whether or not he had any knowledge of these accounts, and whether a marital ben-efit was obtained from the expenditures under these accounts.

### 4. All American Stock Account and Credits on Home

In Paragraph 39 of wife's Motion, wife complained that the Court failed to take note that husband had not placed any additional monies into his All American Stock account following the parties' separation. The Court was mindful of this reality, which could have been susceptible to several explanations, many of them being clearly appropriate. The Court reviewed *Exhibit 27*, and *Exhibit 13*, being the husband's and wife's All American Select account statements, respectively. Upon this review, it became obvious to the Court that both husband and wife's account declined considerably between the years 2000 and 2002 due to serious market decline. Knowledge of such a decline certainly would have discouraged any investor from contributing monies into such an investment at that time. The asset was not concealed. Wife failed to provide any additional testimony to the Court to demonstrate that possible monies may have been diverted elsewhere.

In wife's Paragraph 34 of her Motion, she alleged that the Court incorrectly awarded credits for payments husband had made on the house while wife was occupying the house. The Court has reviewed its Decision on this matter, and believes it was correct.

### 5. Failure to Cite Legal Precedent

At the outset of this opinion, the Court noted that one (1) of the purposes of a legitimate Motion for Reargument is to show the Court that it overlooked a precedent or legal principle that would have controlling effect.[5] Paragraphs in wife's

---

**5.** *Interim Health Care v. Fournier*, Del. Ch., C.A. No. 13003, Jacobs, V.C. (Mar. 25, 1994) 1994 WL 148266 (Del. Ch.1994).

Motion too numerous to mention contained general conclusions that the Court erred in law. If the Court actually committed legal error, the Court believes it would have been appropriate for counsel to have cited specific cases setting forth the precedent or legal principle which the Court supposedly violated. Wife's Motion for Reargument did not cite any cases. Instead, wife's Motion contained the most general of non-supported legal conclusions. The Court reviewed all of wife's arguments, and the Court believes that it applied the law appropriately.

In one (1) instance, Paragraph 6 of wife's Motion, wife argued that the Court failed to appreciate the form of ownership of the business entity involved, and stated that the *"facts and incantations of the business history are important to proper property division"*. If, indeed, the Court was incorrect in its description of the form of ownership of the business, this still would not have affected the outcome of the case. The Court was tracking the percentage of ownership of the brothers in the business, whether it was a percentage of a separate business, or a percentage of ownership of the stock of a corporation. The Court does not recall wife bringing to the Court's attention at any time the suggested importance of the form of ownership of the family's business which wife now raises in her Motion to Reargue. The Court re-read wife's closing argument, and found no argument by wife which stressed the importance of this issue or how it would make a difference. Wife's present Motion failed to cite any specific cases in support of her argument.

In Paragraphs 20 and 22 of wife's Motion, she argued that the Court failed to observe that the brothers were sharing the profits, although they had different percentages of ownership. She also alleged that the Court failed to observe that the brothers would take money out of the busi-

ness when and as they needed for their own personal purposes. The Court's opinion reflected that the Court was fully aware of both of these practices. It is the Court's understanding that percentages of ownership in a business and the agreement of sharing profits and income do not necessarily have to be the same. The Court is also not aware of any case law that says that the practice of two (2) brothers agreeing to allow each other to take money out of the business account as needed alters the percentage of ownership of the company. Again, wife has failed to provide any case law to suggest the Court was in error.

The Court also fully explained in its Decision the reason it concluded that certain gifts of percentages of stock from one (1) brother to husband were exempt from being marital property pursuant to Title 13, Section 1513(b)(1). Wife raised this same complaint in four (4) separate allegations, being Paragraphs 25, 28, 29 and 50 of wife's Motion. The Court found the transfers of stock from one (1) brother to the other, without consideration, were indeed legitimate gifts. These transfers were documented on the books of the company records. Although wife's attorney stated that the Court's conclusion was in contravention of *"well-settled Delaware law in the area of gifts"*, wife's Motion again failed to cite any specific cases in this area.

### 6. *Harmless Error*

■ Wife's Motion also raised several issues which, even if she was correct, produced no harm to wife. Wife began her Motion by complaining that the background section of the Court's Decision contained many inaccuracies, although wife failed to detail the alleged inaccuracies. This case involved four (4) days of trial over a year's time, and also was sometimes delayed in getting to trial. Although the background section of this case did not

affect the Court's Decision in awarding property, alimony, or fees, the Court believed that it was important to set forth the case's background in order that the parties themselves might better understand why the case took so long.

Wife also raised issue, in Paragraph 35 of her Motion, that the Court ignored the importance of wife providing the list of the NASCAR collectibles. Given that the parties agreed that the NASCAR collectibles would be listed for sale, with the exception of those itemized collectibles which were to go to their children, the Court does not see the importance of having raised this in a Motion for Reargument.

▪ In Paragraph 49, wife noted her objection that the Court spent some time in its Decision presenting case law which would apply if a party were seeking a minority discount in the valuation of the business. The Court went through the argument because it had recalled that husband may have briefly touched upon such an argument. Wife is correct, however, that none of the experts went into any detail about a minority discount argument. What the Court finds surprising, however, is that wife raised this issue when the Court's analysis did not harm wife in the distribution of property. The Court in its opinion granted no minority discount. Had the Court granted any minority discount, it would have further diminished the value of husband's share of the business, which, in turn, would have further diminished wife's interest in husband's marital share of the business.

▪ In Paragraph 37 of wife's Motion, she complained that the Court had sufficient information to value the Wilmington Trust stock, as well as the Willards stock. Frankly, the Court recalls that the information provided on the Wilmington Trust stock and Willards stock was, at times, inconsistent. Wife's 52(d) filing, at Paragraph 13(b), acknowledged that the value

of the Bank of Willards stock was difficult to obtain. The special teleconference the Court held with the attorneys on December 2, 2003 also failed to clear up the stock issues. Even if the Court overlooked accurate information which would have provided sufficient valuation of these two (2) stocks, no prejudice resulted to wife because the Court's Order required these stocks to be divided sixty-five percent/thirty-five percent (65%/35%) favoring wife, rather than awarding the value of the stock to one (1) party or the other.

### 7. *Alimony*

▪ The Court's Decision denied wife's claim for alimony. Although the Court discussed various testimony concerning the issue of alimony, the reason wife's claim for alimony was denied was because she failed to submit necessary information to the Court despite having ample time and warning to do so. The Court's Pre–Trial Order of March 23, 2001 made very clear the necessity for the parties to update their current income and expenses. In husband's testimony given on the second to last day of trial, June 23, 2003, husband gave specific testimony concerning his income and expenses. He was subjected to cross-examination on these items by wife's attorney. Husband's *Exhibit 35* set forth husband's expenses. Wife testified less than one (1) month later. Surely, husband's specific testimony on his income and expenses should have alerted wife of the necessity that she also needed to provide testimony of her income and expenses. For reasons the Court cannot explain, wife never gave this testimony.

Perhaps not wanting to admit that she simply failed to supply to the Court the necessary documents and testimony, wife's Motion attempted to raise several other arguments as to why the Court should reconsider its Decision to deny

wife alimony. Starting with Paragraph 22, wife suggested that the Court failed to acknowledge that husband and his brother routinely allowed each other to take money out of their business as they needed. In Paragraph 33, wife argued that the Court erred in placing the value of the truck in the business inventory valuation, rather than applying a value of the use of the truck as would be done for Federal income tax purposes. The Court's comments on the truck value were made on the issue of property division, and the truck value should only have been included either as a separate item or within the business appraisal. Although the value of the 'use of' the truck might have been relevant in the determination of alimony, wife simply failed to provide her necessary information so to allow the Court to come to that consideration. The Court even held a telephone conference between counsel on December 2, 2003. This occurred following the final hearing, and prior to rendering its Decision, to remind the parties that the record had been left open for them to provide their current income tax returns and for wife to also provide her current pay stubs. Despite this additional reminder, wife still failed to supplement the record with her 2002 income tax return and her present 2003 pay stubs. This is clearly contrary to wife's allegations in Paragraph 44 where she alleged she provided the necessary documentation.

The Court was extremely careful in its review of what wife had submitted, or failed to submit, in reference to her claim for alimony. Having reviewed all of the exhibits that were submitted into evidence, as well the Rule 52(d)s filed by each of the parties as to their Proposed Findings and Conclusions, and also their written closing arguments, the Court has concluded that wife never submitted into evidence a statement listing her present expenses. The only expense statement the Court could find was contained in the 16(c) financial report which was signed by wife on April 13, 2000. The expenses contained on that report were no longer accurate, because the Court knew that wife had moved out of the former marital home into her deceased grandmother's home where wife was now able to live rent-free. Wife provided no statement of expenses which would be associated with living in her grandmother's home, nor did wife provide any statement of current expenses. Although the Court would think that wife would have provided an updated list of expenses in her Proposed Findings of Fact leading into trial, and certainly as part of her written closing argument, no such itemization was provided. The Court also reviewed the tape of the last day of the hearing which occurred on July 28, 2003. The only expenses testified to by wife were an alarm system bill of $75 per quarter, a satellite television bill of $67.90 per month, automobile insurance of $98.74 per quarter, wife's car loan of $449.05 per month, and her Conectiv bill in the amount of $108.27 per month. Wife also referred to payments she was making to J C Penney, Hecht's, Smart Buy, and Peebles, but gave no specific amounts. Of these foregoing amounts, wife indicated that the monthly bills for the alarm and satellite applied to the former marital home where she no longer resided. Wife also indicated that the automobile insurance bill was for a different car she had owned up to July 2002. Wife also testified that she was paying $501.80 per month over ten (10) months to send her children to the Seaford Christian Academy. On cross-examination, however, wife admitted that this bill was being split between she and her husband. Wife simply failed to provide the Court with the proper itemization of expenses to indicate whether or not she was dependent.

The Court also listened very closely to the tape recording of wife's testimony

about her present income. Although wife testified how many hours per week she was working, and for how long she had worked as a bank teller, wife did not testify to her present income for 2003, and she did not know her hourly rate. Although she was able to provide through her *Exhibit 2* a letter regarding her annual pay for 2002, it was important for the Court to know her current income, which wife should have easily provided. Wife testified that her 2002 income tax return had been completed, but she indicated that she did not have it available to provide to the Court. Her attorney offered that he was sure he had it back at his office, and the Court therefore left the record open so that both parties could provide to the Court and each other photocopies of their current 2002 income tax returns. When asked to produce copies of her 2003 pay stubs, wife indicated that she did not have them available either. However, the Court again allowed the record to be left open so that wife could provide both to the Court and to opposing counsel copies of her current pay stubs for 2003. With the record being left open, husband very promptly provided a copy of his 2002 income tax returns to the Court. As the Court was preparing to write its Opinion, being concerned that the Court could not find copies of wife's 2002 return and 2003 pay stubs, the Court held a telephone conference on the record between counsel to reaffirm everyone's understanding that the record had been left open, to be sure that the Court was not missing documents that had been provided, and to allow additional time to provide the documents not yet provided. For whatever reason, wife never provided to the Court a copy of her 2002 income tax returns nor her 2003 pay stubs. By failing to provide this necessary information, which wife and her counsel had ample opportunity to provide, wife failed to prove to the Court that she was

dependent, and her claim for alimony had to be denied.

Also related to alimony, but again ignoring the reality that wife failed to provide the Court with the necessary documentation to act on her claim for alimony, Paragraphs 45 through 48 of her Motion suggested that the Court was incorrect in observing that wife failed to wear her engagement ring at the hearings, that one (1) of wife's trips with her children and her fiancé cost approximately thirteen percent (13%) of wife's past income, that the Court had assumed incorrectly that wife was receiving child support, and that the Court had ignored on husband's income tax return certain deductions which should have only been attributed to husband's new wife. If, indeed, the Court was in error in any of these observations, or lack of them, they were harmless to wife's claim for alimony. The Court is particularly troubled about wife's allegation that the Court had assumed incorrectly that she was receiving child support. In listening to the tape recording of wife's testimony given by her on July 28, 2003, wife specifically stated that she was receiving child support. In fact, she indicated that her ability to pay for the children's Seaford Christian School was coming out of that child support.

In Paragraph 52, wife reminded the Court that husband failed to prove that she had been cohabitating with her fiancé, and that husband made a considerably greater income than wife. Regardless, wife failed to provide the necessary information consisting of her current expenses and income as shown in her current income tax return and pay stubs that she should have provided to the Court. Wife failed to provide this information to the Court despite the obvious necessity to provide such information in order to prove her dependency, despite that husband's coun-

sel had been seeking sanctions for wife's non-disclosure of this information, and despite the opportunity the Court gave wife by leaving the record open to provide this information.

■ In considering whether to award a party alimony, the Court must consider the statutory requirements set forth in Title 13, Section 1512. As a threshold requirement, it is paramount that a person seeking alimony establish their dependency by a preponderance of the evidence.[6] In making that threshold determination of dependency, the Court views the petitioning party's circumstances in light of the specific factors set forth in Title 13, Section 1512(c). The first (1st) of those factors involves a review by the Court of the financial resources of the party seeking alimony, as well as their ability to meet all or part of their reasonable needs independently. In this case, by failing to provide the most basic of information, wife simply failed to prove by a preponderance of the evidence that she was dependent.

### 8. *Income Taxes, Two–List Method and Life Insurance*

In Paragraph 32, wife argued that the Court was incorrect in finding that wife had failed to cooperate on the filing of joint income tax returns, which resulted in the loss of a sizable refund which could have been shared and distributed between the parties. It is the Court's recollection that wife provided no legitimate reasons in her testimony that would have justified her filing an individual return, obtaining a smaller refund, and leaving husband to suffer a large tax responsibility, especially where the parties had used the same tax preparer for many years, and also where the tax consequences and benefits were clearly explained to wife in time for her to have cooperated. Respondent's *Exhibit* 36 is a letter from Layton Johnson, the long-

time tax preparer for the parties, to wife dated August 1, 2000. Mr. Johnson pointed out in his letter the benefits of filing a joint income tax return. His letter also indicated that husband was willing to provide wife with the full refund the parties jointly would have received, that being $975, and that amount being greater than the $524 refund wife received by filing individually. During her testimony, wife acknowledged that Mr. Johnson had obtained for her an extension to file her return. The Court was unable to locate a copy of wife's 1999 income tax return to find out when wife filed her return, and wife was unable to provide that date in her testimony. Wife, again, provided no case law to support her allegation that the Court had made an error in law on this issue. Wife also provided no case law to support her theory that the two (2) list method for dividing personal property is the only method that can be followed by Family Court in dividing personal property. This was one (1) of the several allegations made in wife's Paragraph 43 of her Motion.

■ In Paragraph 38 of her Motion, wife complained that the Court did not require the parties to amend two (2) life insurance policies, each worth $25,000 which were in husband's name, to make the children the irrevocable beneficiaries of the policies. The policies named the children as beneficiaries. The Court finds it interesting that wife would raise this argument, which the Court believes was raised for the first (1st) time in the Motion for Reargument. The Court recalls no request ever made by wife that these policies contain an irrevocable beneficiary designation. The Court does recall emphasizing in its own questioning that husband would have the ability to cash these policies in for a cash surrender value, and the

---

**6.** *Husband B. v. Wife B.*, 295 A.2d 701 (Del. 1972).

Court wondered whether the cash surrender value should be credited to husband. When that issue was discussed, wife agreed on the record that she claimed no interest in these policies, and that she trusted that husband would protect these policies for the parties' children. In reviewing the tape of the hearing, the Court very clearly heard wife's counsel say that "no claim is being asserted".

### 9. Attorneys' Fees: Violation of Court Orders v. Settlement Offers

Beginning at Page 41 of the Court's Decision and Order of the parties' ancillary matters, dated February 2, 2004, the Court addressed certain issues concerning the alleged bad faith of wife. One (1) of those areas involved wife violating a Stipulation and Order that required her to remove herself from the former marital home once husband had refinanced the marital home and paid to wife one-half (1/2) of the net equity. The attorneys placed into evidence several exhibits of letters written between themselves concerning the timing of when husband refinanced the mortgage, when the money was tendered to wife, when she moved out, and also letters regarding a related issue of the disbursal of an escrow check for monies left over from the pay-off of the prior mortgage lender. Both parties gave testimony on this issue. Both parties submitted exhibits of correspondence between the attorneys on this issue, and most, if not all, of those letters were entered into the record without objection from opposing counsel.

A second (2nd) bad faith concern raised at trial, through testimony and photocopies of letters between counsel, all of which came into evidence, concerned wife's failure to provide various documents and information as required in the Court's Pre-Trial Scheduling Order dated March 23, 2001. Included was wife's failure to provide husband with a complete list of personal property in her possession. The Court also commented on the testimony given in the hearing about ten (10) acres of land owned by the parties and the problems that were encountered between the parties which rose to the level of either inaccurate or deceptive information provided by wife's attorney to the farmer about how and to whom the rent should be paid.

It is important to note that none of the above issues involved the Court's inspection of letters between counsel that contained settlement offers between the parties regarding their overall property division and matters ancillary thereto. If any of the letters inadvertently contained offers of settlement, the Court had no recollection of seeing such offers when writing its Decision.[7] The Court can assure the parties that, if the Court saw an offer that was contained in the packet of exhibits, such an offer did not influence the Court's Decision. Also, although the Court commented in its Decision on the issues raised at trial by the parties as just noted under the area of bad faith, the Court has yet to make a final award of attorney's fees. The Court's Final Order requested subsequent affidavits and arguments on attorney's fees. In addition, the fact that the Court set forth in its opinion its observations of what had transpired between the parties on the particular issues of bad faith that were raised, did not influence or affect the Court's overall Decision regarding property and/or alimony.

---

**7.** In reviewing the exhibits for purposes of the Motion for Review and/or Reargument, the Court for the first (1st) time saw a letter of settlement included with the various documents in *Exhibit 31A*. The letter was from Bruce A. Rogers, Esquire to Thomas E. Gay, Esquire, dated January 12, 2001.

Wife's Motion, in Paragraphs 36, 43, 51 and 53, argued that the Court's consideration of the testimony in the above matters, and the correspondence between counsel, violated Rule 408 of the Delaware Rules of Evidence. Rule 408 is worded as follows:

*Rule 408. compromise and offers to compromise.*

*Evidence of (1) furnishing or offering or promising to furnish, or (2) accepting or offering or promising to accept, a valuable consideration in compromising or attempting to compromise a claim which was disputed as to either validity or amount is not admissible to prove liability for or invalidity of the claim or its amount. Evidence of conduct or statements made in compromise negotiations is likewise not admissible. This rule does not require the exclusion of any evidence otherwise discoverable merely because it is presented in the course of compromise negotiations. This rule also does not require exclusion when the evidence is offered for another purpose, such as proving bias or prejudice of a witness, negativing a contention of undue delay or proving an effort to obstruct a criminal investigation or prosecution.*

Probably the most important Delaware case relating to wife's concern that the Court should not have allowed testimony or correspondence regarding certain issues is the Delaware Supreme Court Decision of *Abdel G.S. v. Badrban H.K.*, 453 A.2d 94 (Del.1982). The Family Court Judge in that case, while meeting with counsel in the Judge's chambers, without the parties being present, requested, received, and reviewed a Proposed Stipulation and Order of Settlement which had been drafted by wife's counsel, and which was then adopted, without objection from husband's counsel, as the Final Order of the Court. The Supreme Court's opinion noted that there may be appropriate circumstances where the Family Court Judge may meet with counsel only, if the matters are "*confined to purely legal issues and a very careful and limited inquiry about the possibilities of settlement, may be salutary, particularly in the context of the emotionally-charged atmosphere of a Family Court hearing when the litigants are present.*" The Decision goes on to state, "*Under no circumstances may [the Court] use that occasion to resolve any factual issue on the merits by stipulation of counsel or otherwise unless the parties have clearly agreed on the record. Nor may the Court employ this practice to inject itself into the substance of settlement negotiations or to coerce a compromise, however subtle or well-intentioned its efforts may be.*" The Supreme Court's Decision went on to note that, "*To require the disclosure of settlement proposals...was totally improper.*", citing Rule 408 of the Delaware Uniform Rules of Evidence. The Supreme Court stated further, "*Even where the other attorney did not object to the proceedings, the Supreme Court found that the Family Court Judge had 'induced' counsel to 'produce inadmissible and highly prejudicial evidence during an off-the-record proceeding in chambers...*" The Supreme Court discussed the reality of settlement negotiations, that being that parties are willing to make concessions in an offer to settle all disputes. However, where the efforts to settle fail, each party is then free to pursue all of their rights and remedies. As the opinion noted, "*Were it otherwise, no one would even consider attempting to negotiate their differences.*"

More recently, in a Decision of the Delaware Superior Court, in *Chabbott Petrosky Commercial Realtors, Ltd. v. Robert J. Peterson and Bonnie S. Peterson*, 2002 WL 31814914 (Del.Super.), the Court found Rule 408 of the Delaware Rules of Evidence does not restrict all negotiations

from coming into evidence. In that case, one (1) of the substantive issues before the Court was whether or not offers were made. Thus the Court allowed into evidence *offers* which were part of the operative facts upon which the plaintiff based its claim. The Superior Court thus held that *"Negotiations, in and of themselves, are not offers in compromise."* Indeed, the last sentence of Rule 408 specifically allows offers of compromise to come into evidence where they are *"...offered for another purpose, such as providing bias or prejudice of a witness, negitiving a contention of undue delay or proving an effort to obstruct a criminal investigation or prosecution."*

In this particular action, the Court did not review any offers of settlement. Instead, the Court was reviewing the operative facts as to whether wife had violated two (2) Court Orders, one (1) being the Order to remove herself from the house, and the other being the Court's Pre–Trial Order requiring exchanges of certain information. The Court believes that it would have been preferable for counsel to have requested a later hearing on the issue of attorney's fees which would have included the particular issues noted in the Court's opinion, as well as possible others. However, the Court allowed the arguments at the insistence of counsel. The wife was not prejudiced by its findings as to the overall division of marital property or the award of alimony, except that wife's failure to provide necessary information to support her claim for alimony and certain credit cards, even if they had not been Court-ordered, were necessary to prove her claims. The Court has never reviewed an overall proposal of settlement between the parties.[8] Also, the Court has yet to

rule on the overall awards of attorney's fees. In fact, on Page 74 of the Court's Order dated February 2, 2004, the Court specifically left open the ability of each party to make other applications for costs and attorney's fees.

### 10. *Real Estate—Identity and Value*

Regarding a piece of non-business real estate, the Court is mystified by wife's complaint in Paragraph 30 of her Motion that the Court accepted a value on a ten (10) acre farm parcel based upon an appraisal that was placed into evidence. Although wife anticipated in her 52(d) form that was filed prior to the full day of trial her disagreement with the appraisal that was performed by Mr. Hoffman on July 3, 2001, she presented no credible evidence to suggest the appraisal was incorrect or to suggest a different value the Court should have considered. Certainly, had wife desired to submit another appraisal, she could have done so. In fact, a copy of the appraisal used by the Court, and to which wife now objects, was included as both wife's *Exhibit 19* and husband's *Exhibit 11.*

■ The Court now addresses wife's final argument, and the argument most troublesome to the Court. That argument, restated in various ways in Paragraphs 9, 14, 19, 23, 24, and 26 of wife's Motion, was that the Court's Decision was in error because of the Court's failure to provide a value for the business real estate. Wife is correct in her assertions that the Court noted in its final Decision the Court's inability to place a value on real estate which was owned by the business, which would have therefore increased the value of husband's interest in the business, a percent-

8. In reviewing the exhibits for purposes of the Motion for Review and/or Reargument, the Court for the first (1st) time saw a letter of settlement included with the various documents in *Exhibit 31A.* The letter was from Bruce A. Rogers, Esquire to Thomas E. Gay, Esquire, dated January 12, 2001.

age of which the Court determined to be marital. Wife's counsel would place this responsibility upon the Court. The Court disagrees. It was the responsibility of wife, assisted by her attorney, to pursue her own independent investigation concerning the origin of the real estate on which the business was situated, as well as to pursue an independent appraisal of the same. This information could have been discovered through a diligent search of the land records of Sussex County, including the Office of the Register of Wills. In wife's Family Court Rule 52(d) Proposed Findings of Fact, filed five (5) days before the first (1st) day of trial, wife demonstrated her knowledge of the possible existence of business-owned real estate when, in Paragraph 9 of the 52(d) document, wife stated:

"Respondent is believed to have an ownership interest in a parcel of real property in Broad Creed Hundred (co-owned with his brother, Da B. M) and in the name of the business, C W. M, Sr., and Sons (a Delaware Partnership).

Respondent is believed to have an ownership in another parcel of real property located in Broad Creed Hundred (co-owned with his brother Da B. M) and in the name of the business, C W. M, Sr. and Sons (a Delaware Partnership), conveyed to the Respondent by a third brother.

Respondent is believed to have an ownership interest in another parcel of real property located in Broad Creek Hundred (co-owned with his brother, Da B. M) and in the name of C W. M, Sr. and Sons, conveyed to Respondent in October, 2001. This land was conveyed as an extension or addition to adjoining lands of the grantees (Respondent herein) and not as a separate parcel."

Wife's expert, Mr. Sterner, reported to wife in sufficient time before the trial came to an end, that his appraisal contained the limiting condition that he had not valued real estate upon which the business was situated. Mr. Sterner's testimony noting this limiting condition came on the first (1st) day of trial, which occurred on August 14, 2002. Noting this limiting condition, the Court thereafter sent a letter to both counsel on August 28, 2002 noting certain concerns, one of those involving the lack of valuation for the business real estate. The Court's letter specifically stated the following:

1. ***Company Land and Real Estate:*** The Will of A C M devised specifically identified land to her three (3) stepsons, along with her bequests of other items owned by the business, namely equipment, bank accounts, etc. Also, the Agreement wherein the one (1) brother, R M, sold out his interest in the company to his two (2) brothers specifically made reference to real estate, and, even placed a specific value of the overall sale on the real estate. And yet, neither accountant in their respective business evaluations has provided any value for real estate, although Mr. Sterner notes the absence of the real estate to be a limiting condition to his report. It will certainly be helpful to know more about the real estate on which the business is situated, and whether the transfers of ownership interest between the brothers from the date of their stepmother's Will included transfers of real estate. The Court is wondering whether any deeds were executed to this effect.

Wife and her attorney should have performed the necessary title search investigation and appraisal work prior to the first day of trial. Even if not thought of prior to the first day of trial, there was ample opportunity to do the necessary work during the five (5) months before the next day

of trial which occurred on January 8, 2003, and clearly before nearly the almost year's time from the first (1st) day of trial on August 14, 2002 to the last day of trial on July 28, 2003. The Court is extremely troubled by the allegation of wife and her attorney that the Court failed to appreciate the lack of valuation of the real estate. In fact, as set forth above, the Court noted its concern. Wife argued that husband should have provided this information. But husband was arguing that the business was not marital, so there was less incentive for husband to emphasize the issue by specifically defining the property and providing a real estate appraisal of the same. Wife accused husband of concealing the assets, but the real estate was not concealed—everyone knew the location of the business real estate. It was the clear duty of wife and her counsel to pursue, prepare, and present this information to the Court.

Before concluding this Decision, it is important to review the specific allegations contained in wife's Motion for Reargument suggesting that the Court ignored valuing the real estate of the business. The allegations contained in the Motion, including the numbered paragraphs of wife's Motion, are as follows:

*Paragraph 9:* On Page 11 of the Opinion and Order, the Court noted that Mr. Sterner (the petitioner's independent accounting expert) did not include company-owned real estate as a limiting condition. The Court failed to appreciate that the respondent did not include the real estate in question in his 16(c) or joint asset report, thereby negating the petitioner's opportunity to review, appraise and value said real estate.

*Paragraph 14:* On Page 14 of the Opinion and Order, the Court seized upon a point made repeatedly by the petitioner— to wit—the failure of the respondent to account for or disclose the real properties supposedly conveyed to the business when A C. M died. Instead of questioning the non-disclosure (and presumably bad faith) of the respondent, the Court simply chose to ignore the fact in valuing the business.

*Paragraph 19:* On Page 19 of the Opinion and Order, the Court held that the respondent inherited the business from his stepmother, without proof in the record and without legal basis, in contravention of Title 13, Section 1513.

*Paragraph 23:* On Page 24 of the Opinion and Order, the Court acknowledges the failure of the respondent to account for business or personal real estate, as well as substantial accounts left by the respondent's stepmother upon her death. The Court fails, however, to account for the non-disclosure and secreting of real estate during trial in the balance of its opinion.

*Paragraph 24:* On Page 25 of the Opinion and Order, the Court acknowledged that the elderly tax preparer for the business indicated that two (2) of three (3) parcels of real property belonged to the business and not the respondent. There was absolutely no proof in the record to support this conclusion. However, the Court accepted this testimony from an obviously biased witness without question.

*Paragraph 26:* On Page 29 of the Opinion and Order, the Court stated: "*Although these different figures among these various documents raised questions in the mind of the Court, no expert came forward to assist the Court in revising the business valuations by the possible inclusion of business real estate. It is not up to the Court to guess at these matters.*" In fact, petitioner's expert raised the issue of the real property, the inability to value same due to the non-disclosure on the part of the respondent, and the Court extensively questioned Mr. Sterner on these points. At the conclusion of the hearing, petitioner was unable to divine that the Court still had questions as to this asset.

In reviewing the combination of these paragraphs, the Court is reminded that there were two (2) things missing from wife's presentation in this case. First, wife failed to identify in her own case whether or not land and improvements upon which the business was operating was in fact owned by the business. In fact, when the Court reviewed the allegations in the above-referenced Paragraphs 19 and 24 of wife's Motion, it would almost seem that wife was opposed to any suggestions made by the Court in its Opinion that husband inherited his share of the business from his stepmother (Paragraph 19), and that some of the property inherited from the estate of the stepmother contained two (2) of three (3) parcels of real property which belonged to the business (Paragraph 24). The Court drew its conclusions from the testimony of husband, the company bookkeeper, Mr. Johnson, who also prepared the stepmother's estate documents, as well as a review of the Will of the stepmother along with her Estate Inventory and Delaware Inheritance Tax Return. If there existed any other manner in which husband would have acquired any interest in the real estate upon which the business property is located, wife has presented no evidence of such an acquisition. And yet, wife seems to argue that it was wrong for the Court to conclude that the brothers' inheritance from their stepmother, as part of their inheritance of the business interest, included two (2) parcels of the real estate identified in the estate proceedings of their stepmother. The Court is perplexed by wife's apparent unwillingness to accept that the business real estate, and husband's interest therein, was inherited. By negating this theory, wife negates her ability to claim her interest of the inherited interest of the three (3) brothers, part of which later became a marital interest when husband and his one (1) brother bought out the share of their third (3rd) brother during the marriage.

During the proceedings, it was clear to the Court that husband did not fully understand the nature of the acquisitions of property through inheritance or otherwise, nor did husband understand the importance of how an item was titled, be it in his own name, or in the name of the business. It is correct that husband failed to list the real estate in the advance disclosures required of the Court. However, the issue clearly became evident to all on the first (1st) day of trial, and it was clearly more important for wife to pursue defining the specific properties involved, which should have been easily a matter of record, and also to then obtain an appraisal of those properties.

Wife failed to prove the value of the real estate. Wife seemingly even failed to present a legitimate case as to the existence of the business real estate as marital property. It was only through Mr. Sterner's observations in his appraisal, as well as the combination of the testimony of Mr. Premo (husband's expert) and Mr. Layton (business bookkeeper), in combination with a review of the Last Will and Testament of A C. M as well as her Inventory and Inheritance Tax Return, that the Court was able to surmise that a value in real estate actually passed to the three (3) brothers as part of their inheritance of the family logging business.

This leads the Court to an interesting finding. Wife's Motion failed to cite any cases, or contain any arguments which suggested the Court should take further action in valuing the business-associated real estate, except to say the Court should have somehow guesstimated the property or admonished the husband for allegedly failing to disclose the property. However, the Court's own observations and research, based upon the evidence presented, has led it to the conclusion that wife is entitled to a rehearing solely on the issue of deter-

mining which real estate is considered the business real estate, and the value of that real estate. To do otherwise, would produce a windfall to husband of titled property in which wife holds some marital interest. The Court acknowledges that it was a mistake to allow the husband's marital interest in the family logging business to pass completely to him because wife failed to both identify those properties and to take the necessary steps to value them. Delaware case law is clear. Our Delaware Supreme Court on at least two (2) occasions has held that the failure of a spouse to establish the value of the other spouse's interest in property does not mean that the entire interest in that property should be awarded to the other spouse. Instead, the matter should either be reconsidered by the trial Court,[9] or the Court should award the interest on a percentage basis when, as, and if, the property is liquidated.[10] Given the possibilities of how the Court now understands it may need to decide this issue, it may behoove both sides to undertake this identification and valuation.

### 11.　*Counsel's Duty to Advance Legitimate Allegations*

　Regretfully, the Court cannot close without making a final observation. The Preamble to the Delaware Professional Conduct Rules states that a lawyer is *"an officer of the legal system and a public citizen having special responsibility for the quality of justice."* [11] *"A lawyer should use the law's procedures only for legitimate purposes and not to harass or intimidate others."* [12]　Rule 3.1 of the Delaware Professional Conduct Rules, entitled "Meritorious Claims and Contentions" requires attorneys to only assert issues where there is *"a basis in law and fact for doing so that it is not frivolous . . ."* [13] Rule 3.3 requires a lawyer to demonstrate candor to the Court. Pursuant to Rule 3.3, a lawyer shall not knowingly *"make a false statement of fact or law to a tribunal . . ."* [14]

The Court is never troubled to devote its time and attention to matters which are raised on legitimate allegations of clear errors in fact and/or clear errors in law supported by the citation of appropriate authorities. In wife's Motion for Reargument, the Court saw neither.

Thankfully, there was a benefit to wife's Motion for Reargument being filed. It gave the Court a second (2nd) chance to look at its decision before appeal, which is indeed one of the purposes of a Motion for Reargument.[15] Thus, not only has wife benefited from the filing of the Motion, justice will also be better served. The Court is not troubled that wife's Motion for Reargument revisited the issue concerning the business real estate. The Court is not even troubled, in raising the issue, that wife's Motion failed to provide for the Court the proper legal theory and supportive citations. The Court fully appreciates that lawyers at times may overlook in their research the appropriate legal theories to benefit their client's cause. In fact, the Court readily admits that the Court was troubled when its Final Deci-

9.　*Gregg v. Gregg,* 510 A.2d 474 (Del.1986).

10.　*Cathleen C.Q. v. Norman J.Q.,* 452 A.2d 951 (Del.1982).

11.　Delaware Professional Conduct Rules, Preamble [1].

12.　Delaware Professional Conduct Rules, Preamble [5].

13.　Delaware Professional Conduct Rules, Rule 3.1.

14.　Delaware Professional Conduct Rules, Rule 3.3(a)(1).

15.　*Hessler, Inc. v. Farrell,* 260 A.2d 701, at 702 (Del.1969).

sion left the business real estate completely to husband. The Court also overlooked the appropriate theory, which, given the ability of the Court to take a second (2nd) look by reason of wife's Motion for Reargument, the Court was finally able to properly resolve the issue. It was appropriate for the wife to have raised the issue of the trailer rent, although, in the entire picture of this case that issue was quite trivial and insufficiently developed at trial. The Court is never troubled when issues are raised on a Motion for Reargument out of a certain amount of caution, where, although unlikely to succeed, have the possibility of being reconsidered.

What troubles the Court, however, is that out of fifty-three (53) allegations in the Motion, many of them repetitive, only seven (7) of the allegations had merit. Six (6) of the allegations involved the business, and one (1) of the allegations involved the trailer rent. Most of the remaining forty-six (46) allegations contained numerous factual inaccuracies and unsupported legal arguments. The Court believes that an attorney using proper diligence and expressing proper candor to the Court would have never raised the vast majority of these additional allegations. Through proper diligence the attorney would have studied the Opinion carefully, along with his notes, and perhaps reviewed the recordings of the proceedings, or parts of them. The attorney, recognizing his responsibility of candor to the Court, would have not raised these additional issues, and would have instructed his client of the attorney's responsibility had the client desired the issues to be pursued. An attorney demonstrating proper diligence would have also supported the allegations by exact reference to alleged exhibits. The at-

torney would have attached photocopies of those alleged exhibits to the pleadings in order to assist the Court. In this particular case, the attorney's failure to do so has caused the Court to spend untold hours reviewing the file in depth. An attorney demonstrating proper diligence would have also supported his arguments that the Court had made an error in law with appropriate citation of authority. In this particular case, not one (1) case was cited.

In certain instances, the complaints raised in counsel's Motion demonstrated that he failed to read the Court's Decision closely. All of this causes the Court to have serious questions about the reasonableness of the inquiries made by counsel, and whether or not a proper purpose motivated the filing of almost all of the aforesaid allegations.[16] The Court is further concerned that husband had to spend money for his attorney to oppose this Motion. Wife's Motion, allowed and pursued by her counsel, has clearly added to the already overly litigious nature of this case. It is only through a stroke of luck or divine intervention that the Court, based upon its own research in responding to wife's Motion, discovered that it is necessary to rehear the matter, but on the limited issue of the business real estate. As such, the Court is of the opinion that wife's counsel should be held accountable for payment of those attorney's fees expended by husband in defending against this Motion.[17]

For all of the foregoing reasons,

IT IS HEREBY ORDERED:

1. Wife's Motion for Reconsideration/Reargument is hereby DENIED in part and GRANTED in part, limited to a hearing on the identification and valuation of the business-associated or other husband-owned real estate, including im-

---

**16.** See Family Court Civil Procedural Rule 11.

**17.** *Mayes v. Mayes,* Del.Supr., No. 364, 1987 Christie, C.J. (November 23, 1988) (Order);

and *A.L.M. v. T.C. M.,* 2001 WL 1773730 (Del.Fam.Ct.2001).

provements thereon and any rental income obtained there from, in order to determine the value of the marital interest therein, as well as any adjustments for rental income that may have been received during the separation of the parties.

2. Husband's request to modify the percentage division made in his Answer *"by way of further response"* is hereby DENIED.

3. The Court will entertain a Motion from husband's counsel seeking attorney's fees to be paid by wife's counsel which were incurred by husband's counsel in preparation of his response to wife's Motion for Reargument/Reconsideration, contingent upon husband's Motion being submitted to the Court within ten (10) days from the date of the mailing of this Order.